**SIGNED THIS: September 15, 2009**

_____
**MARY P. GORMAN
UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In Re ) | |
| ) | In Bankruptcy |
| VANCIL CONTRACTING, INC., ) | |
| ) | Case No. 06-71254 |
| Debtor. ) | |
| _____ ) | |
| ) | |
| VANCIL CONTRACTING, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary No. 07-7069 |
| ) | |
| CHARLES E. ROBBINS, ) | |
| as beneficial interest partner, ) | |
| ART SEPPI, ) | |
| as beneficial interest partner, ) | |
| ILLINOIS NATIONAL BANK, ) | |
| as Trustee under Trust Agreement ) | |
| dated 11/6/2000 and known as ) | |
| Trust No. 00-0020, ) | |
| SWPLAZA III, LLC, ) | |
| as successor in interest, ) | |
| ) | |
| Defendants. ) | |

# **OPINION**

This case is before the Court for decision after trial of the six-count First Amended Complaint of Vancil Contracting, Inc. ("Vancil") to collect pre-petition accounts receivable. Because the accounts are old and Vancil was dilatory in billing and collecting the accounts, the defendants have raised defenses of waiver and estoppel. Having considered the testimony of witnesses, the exhibits entered into evidence, and the arguments of counsel, the Court finds that the defenses have not be proven and that, accordingly, judgment should enter for Vancil on each count.

Vancil filed its voluntary petition under Chapter 11 of the Bankruptcy Code on September 18, 2006.[1] On June 21, 2007, Vancil filed this case against Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000, and known as Trust No. 00-0020 ("INB"), and Charles Robbins and Art Seppi, as beneficial interest partners ("Partners"). On August 13, 2007, Vancil filed its First Amended Complaint adding SWPlaza III, LLC, as successor in interest ("SWPlaza"), as a defendant.

Vancil is engaged in the business of commercial construction in Springfield, Illinois. Partners are in the business of developing, operating, and managing shopping centers and other

---

[1] Vancil's Third Amended Chapter 11 Plan was confirmed on September 10, 2009, after a contested confirmation hearing.

-2-

commercial properties.  INB was the titleholder to the properties involved in this case at the time of Vancil's construction activities, and SWPlaza is the successor titleholder to the properties.  Vancil seeks to collect three separate accounts from INB, Partners, and SWPlaza.

The first account Vancil is trying to collect is for $39,524 and relates to the construction of a shell building on South Veterans Parkway in Springfield, Illinois, and the finishing of space in that building for a David's Bridal store.  On June 25, 2002, Vancil entered into a contract with INB and Partners for the construction of the 20,500 square foot shell building at a charge of $40 per square foot for a total of $820,000.  Additionally, the contract provided for Vancil to finish 9000 square feet of the building for use by Partners' tenant, David's Bridal, at an additional cost of $25 per square foot which added $225,000 to the total cost of the project.  The contract also provided for Vancil to finish additional spaces of 9000 square feet and 2500 square feet in the shell building for the same $25 per square foot charge for yet unknown tenants. Completion of these two additional spaces added $225,000 and $62,500, respectively, to the total contract price.  Thus, the contract anticipated a total cost of $1,332,500 to construct and finish the entire project.

By mid-August 2002, Vancil had substantially completed construction of the entire shell building and the finishing of the

David's Bridal space.  On August 16, 2002, Vancil submitted a pay request for the project to Partners.  That pay request showed a total contract price of $1,332,500 and asserted that $954,899 of work had been done to that date.  Because Vancil had previously been paid $421,873, the pay request claimed that $533,026 was due.  That amount was paid by Partners from their construction escrow account at Bank of Springfield on August 23, 2002.  The pay request also identified the balance to finish the project as $377,601.

On October 2, 2002, Ron Vancil, President of Vancil, sent an email to Art Seppi regarding the project.  In that email, Mr. Vancil stated that calculation of the final cost for the shell building and the finish of the David's Bridal space was almost complete and it looked as though the total cost for those portions of the project would be about $983,108 rather than the $1,045,000 set forth in the contract.  Mr. Vancil promised to get back to Mr. Seppi in about a week to finalize the numbers.  It is undisputed that Mr. Vancil did not keep that promise.

In March 2003, Vancil completed the finish work for the 2500 square foot space in the shell building.  On March 14, 2003, Vancil billed $61,955 for the work which had been priced in the contract at $62,500.  Partners paid the amount invoiced on March 26, 2003.

In October 2003, Vancil completed the finish work for a small portion of the remaining 9000 square foot space in the shell building.  Vancil billed a total of $83,800 in several installments

for this finish work. Each installment was paid promptly by Partners.

Although Vancil continued to work on other projects for Partners over the next several years, Vancil did not do any further work on the remaining space in the shell building for Partners and did not final bill for the construction of the shell building and the finish of David's Bridal until August 15, 2006. On that date, Vancil submitted a final pay request. That pay request showed the initial total contract price of $1,332,500 and subtracted from that a credit of $338,077 resulting in a final contract price of $994,423. The $338,077 credit was composed of the deletion of the $225,000 contract price for the 9000 square foot space, the deletion of the $62,500 contract price for the 2500 square foot space, and a deduction of $50,577 for "job savings." Because Vancil had been paid a total of $954,899 pursuant to earlier pay requests, the final pay request claimed a balance due of $39,524.

Vancil now seeks to collect the balance of $39,524 from INB, Partners, and SWPlaza. INB, Partners, and SWPlaza all deny that they owe any money to Vancil for the shell building and David's Bridal because they collectively assert that, due to the delay in billing, Vancil waived its rights to collect any sums due and should be estopped from asserting that monies remain due.

The second account Vancil is trying to collect relates to a contract entered into on January 6, 2003, by Vancil and INB and

Partners for Vancil to furnish construction services for a 21,970 square foot building also located on South Veterans Parkway in Springfield, Illinois.  The building was to be occupied by Partners' tenant, Bed Bath and Beyond ("BBBY").  The Contract provided for a total construction cost of $1,449,000.  Subsequent undisputed change orders added $7,758 to the cost, raising the total to $1,456,758.  Pursuant to four separate pay requests, Vancil was paid a total of $1,442,194 through June 15, 2003, when the project was substantially completed.  Vancil's fourth pay request showed a balance to complete of $14,564.

Vancil took no action to collect that remaining balance until August 15, 2006, when it submitted a final pay request for $22,825. The $22,825 consisted of the previously calculated balance due of $14,564 plus an additional amount of $8,261 claimed to be due for extra work associated with a water main extension.

Vancil now seeks $23,329 - the $22,825 billed in August 2006 plus some additional charges - from INB, Partners, and SWPlaza with respect to the BBBY contract.  INB, Partners, and SWPlaza collectively defend on the basis that they are not contractually obligated to pay for the extra work for the water main extension and, in any event, Vancil has waived its rights to collect any amounts due and should be estopped from asserting any amounts are due by reason of the delay in billing for this project.

The third account Vancil is trying to collect relates to a

contract entered into by Vancil and INB and Partners on February 17, 2003, for Vancil to provide construction services for a 14,800 square foot building also on South Veterans Parkway in Springfield, Illinois. This building was to be occupied by an Old Navy store. The contract provided for a total price of $561,000. Through undisputed change orders, the total price was reduced to $545,964. The project was substantially completed by July 22, 2003, when Vancil submitted its second pay request. After that request was paid, Vancil had received a total of $540,504 leaving a balance due of $5460. Vancil never took any action to collect that balance until it issued a final pay request for the amount on August 15, 2006.

Vancil now wants $5460 from INB, Partners, and SWPlaza. INB, Partners, and SWPlaza again collectively defend on the assertions that Vancil has waived its rights to collect these sums and should be estopped from claiming that the monies are due.

Through the trial testimony of Ron Vancil, Vancil established a *prima facie* case that at least some of the amounts claimed due for each account are, in fact, owed by the defendants.[2] Thus, the burden shifted to the defendants to present proof of their asserted

---

[2] No evidence was presented regarding why SWPlaza would be liable for the contractual obligations of INB and Partners. All of the defendants were, however, represented by the same attorney at trial who stated on the record that the defendants were not raising a defense as to the legitimacy of the successor liability claim against SWPlaza.

defenses. The defenses of waiver and estoppel were asserted as to all counts and, if successful, would preclude the entry of judgments on any of the counts.

Waiver is the intentional relinquishment of a known right.[3] Gallagher v. Lenart, 226 Ill.2d. 208, 229, 874 N.E.2d 43, 56 (2007). Waiver arises from voluntary, affirmative acts or consensual conduct of a party which evidences an intent not to enforce a particular known right. Home Ins. Co. v. Cincinnati Ins. Co., 213 Ill.2d. 307, 326, 821 N.E.2d 269, 282 (2004).

Estoppel is an equitable doctrine that prohibits a person from acting in a particular manner and then acting in an inconsistent manner to the prejudice of another who relied in good faith upon the initial acts. First American Title Ins. Co. v. TCF Bank, F.A., 286 Ill.App.3d 268, 275, 676 N.E.2d 1003, 1008-9 (1997). A party may be estopped from asserting a right or position against another when that party has induced the other to rely on conduct or representations and, as a result of that reliance, the other has changed positions to his or her detriment. *See* Trossman v. Philipsborn, 373 Ill.App.3d 1020, 1040-41, 869 N.E.2d 1147, 1164 (2007).

---

[3] The contracts used for each project are forms from the Associated General Contractors of America and all specifically provide that the contract provisions are governed by the laws of the location of the project subject to the contract. All projects involved in this case are located in Springfield, Illinois and, therefore, citation to Illinois law is appropriate here.

Although the same conduct of a party may give rise to defenses of both waiver and estoppel, the two defenses are distinct. Waiver occurs by reason of a party's own intention to relinquish a right. <u>Gallagher</u>, 226 Ill.2d *at* 229, 874 N.E.2d *at* 56. Estoppel, on the other hand, is established by proof of the effect of a party's conduct on another. <u>Trossman</u>, 373 Ill.App.3d *at* 1040, 869 N.E.2d *at* 1164.

Art Seppi testified that Partners received no billings from Vancil after projects were completed in 2002 and 2003 until August 15, 2006, when final pay requests were issued. Mr. Seppi testified that, in January 2004, Partners refinanced their construction loans with respect to all three projects involved here and obtained permanent financing through Archon Financial, L.P. ("Archon"). As part of that financing transaction, Partners and SWPlaza represented in mortgage documents that all costs and expenses of the construction projects had been paid in full. Mr. Seppi also testified that, once Partners and SWPlaza obtained permanent financing, many of the documents associated with the three construction projects were destroyed and, accordingly, were no longer available to be consulted for defense purposes. Mr. Seppi also stated that the architect on the projects had retired and he implied that the unavailability of the architect caused him and the other defendants problems in putting together their defenses.

On cross-examination, Mr. Seppi admitted that he had not

contacted Vancil prior to the refinance in January 2004 to ascertain if the representations he would be making to Archon were correct, and he was unaware if anyone else had made such an inquiry on his behalf or on behalf of the other defendants.  Mr. Seppi stated that he relied on his lender and title insurance company to make the necessary inquiries.  He also admitted that, although the individual architect who had worked on the project had retired, the architect's former partner continued to maintain the architectural firm and, accordingly, the firm's records were available.

Ron Vancil testified that he did not complete the billings on the three projects because he was busy working on other projects for Partners including the construction of a Hilton Gardens Hotel. He also stated that he expected to be hired to complete the shell building as Partners found tenants for the remaining space.  Mr. Vancil testified that, in August 2006, he drove by the building and saw another contractor working on the space and realized that he was not going to be given an opportunity to complete the contract. Numerous problems had developed on the Hilton Gardens Hotel project and Vancil's relationship with Partners had "gone south."  It was then that he finalized the billings for the three outstanding accounts.

Insufficient evidence was presented by the defendants to support a finding that Vancil waived its rights to collect the accounts involved in this case.  The pay requests submitted by

Vancil as each project neared completion clearly showed that balances were due on each project.  Although Vancil was dilatory in getting its final billings done, there is no evidence that it ever intended not to bill the final amounts due for each project. Absent any evidence of an affirmative act or some conduct of Vancil which would indicate that it had decided to waive the balances due on the accounts, the defense of waiver cannot be sustained.

Insufficient evidence was also presented by the defendants to support a finding that Vancil should be estopped from collecting the accounts.  Art Seppi admitted that the representations made by Partners and SWPlaza to Archon in January 2004 were made without consultation with Vancil about whether any amounts remained due for the construction projects.  To the contrary, all documents any of the defendants or their agents had in hand at the time of the refinancing indicated that balances were due for each project. Thus, Vancil did not do anything to induce the misrepresentations to be made.  Vancil had no interest in or even knowledge of the refinancing transaction and did nothing to cause the Partners and SWPlaza to misrepresent the payment status of the projects to their lender.

Vancil's delay in billing also did not induce any of the defendants to destroy or discard important documents.  Art Seppi's testimony about what was destroyed, when it was destroyed, and why it was destroyed was vague.  Basically, he asserted that once

permanent financing was in place and spaces were rented, there was no reason to keep construction paperwork.  To the extent that Mr. Seppi was referring to the destruction of architectural plans, schematic drawings, and other technical documents regarding the construction projects, the practice would seem doubtful.  Buildings can be damaged by fire, natural disasters, or other causes.  Buildings need to be remodeled from time to time as tenants renew leases or new tenants take over spaces.  Original plans and drawings would be needed for any such reconstruction or remodeling.  Further, all of the space in the shell building was not fully finished when the permanent financing was put in place, so it would have made no sense for the construction documents to have been disposed of in January 2004.  Finally, even if Partners discarded their copies of documents, that does not mean that their architectural firm, Vancil, or the various tenants occupying the finished spaces did not have copies of relevant documents.  Mr. Seppi did not identify any documents needed for his defense which, after diligent efforts, he was unable to obtain.

Likewise, to the extent that Mr. Seppi was referring to financial documents related to the construction rather than the actual construction documents, his testimony made little sense. The payments on the shell building were made from a construction escrow account and, several times at trial, Mr. Seppi referred to relying on a title insurance company to handle his transactions. Title

insurance companies must generally retain their records from escrows and closings for seven years. *See* 215 ILCS §155/21.3. Thus, records of pay requests, payouts, and the like should still be available from the title insurance company used by Partners. Mr. Seppi did not identify any particular financial records he needed or any efforts he made to get copies of relevant financial records from his construction lender or his title insurance company.

   INB, Partners, and SWPlaza failed to prove that Vancil should be estopped from collecting the accounts. Vancil did nothing to induce the defendants to change their position or to act to their detriment with respect to the accounts at issue here.

   Because the defenses of waiver and estoppel were not established, Vancil is entitled to judgment on each count of the First Amended Complaint. Counts I and II seek judgment against INB, Partners, and SWPlaza for $39,524 relating to the shell building and David's Bridal. The amount claimed was calculated by taking the gross contract price and subtracting payments previously received, the amounts allocated for finishing the 9000 and 2500 square foot spaces, and $50,577 for cost savings. Art Seppi questioned whether the cost savings were calculated correctly but that is of no matter. The contract was for a fixed price and Vancil had no obligation to pass on any cost savings. The subtraction of the $50,577 was wholly gratuitous and, therefore, defendants have no basis to argue that a larger credit should have

been given.  Judgment will enter on Counts I and II in favor of Vancil.

Counts III and IV seek judgment for $23,329 related to the BBBY contract.  That amount varies from the $22,825 claimed due on the August 2006 final pay request and the discrepancy was not fully explained at trial.  But the issue is also of no matter because judgment will only be entered for $14,564, which is the amount due pursuant to the contract.  The additional amounts claimed are for extra costs Vancil incurred to connect the building to municipal water service.  It is not disputed that, prior to the contract signing, the parties were aware that the municipal water main which would serve the building was being relocated but the precise details of the relocation were not yet known.  Thus, Vancil guessed at the cost of connecting to the water main in its bid.  When the main was finally installed, it was located at a greater distance from the building than anticipated and, therefore, the cost of constructing the lines to connect to the main were higher than expected.

The defendants correctly argue that they are not responsible for Vancil's cost overrun in connecting to the municipal water main. The contract was for a fixed construction price. Vancil did not carve out from its bid any right to increase its charges based on the ultimate location of the water main even though it knew that its bid was based on a guess.  Just as Vancil was not required to

pass on the cost savings for the shell building, it is not entitled to pass on cost overruns for the BBBY project either. The contract was for a fixed sum and that is all that can be awarded. Judgment will enter accordingly.

Counts V and VI seek judgment for $5460 for the Old Navy project. The amount sought is the contractual amount due. Judgment will enter accordingly.

Vancil also seeks pre-judgment interest and costs. Pre-judgment interest should generally be awarded unless there is a sound reason not to make the award. <u>Matter of Milwaukee Cheese Wisconsin, Inc.</u>, 112 F.3d 845, 849 (7th Cir. 1997). The award of pre-judgment interest is, however, within the sound discretion of the Court. <u>In re Cybermech, Inc.</u>, 13 F.3d 818, 822 (4th Cir. 1994). Here, the Court will use its discretion to deny pre-judgement interest. Although Vancil's delay in billing is not a basis for finding that Vancil has waived its rights or should be estopped from asserting its rights, Vancil also should not be rewarded for clearly dilatory conduct. All of the evidence established that Vancil's timely pay requests were promptly paid and, accordingly, there is no reason to believe that the accounts involved here would not have been paid if timely billed. There is no reason to shift the loss of the time value of money to the defendants when the entire reason for the delay rests with Vancil.

Costs are generally awarded to a prevailing party in an

adversary proceeding. Fed.R.Bankr.P. 7054(b). Here, however, the Court will deny the request for costs. There is no reason to believe that this litigation would have been necessary but for the delay in Vancil's billings. The defendants paid all timely submitted pay requests promptly and appear to have only objected to the payment of these accounts because they were so annoyed at the delay in billing. The parties shall bear their own costs of suit.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###